**Opinion issued December 18, 2018**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00393-CV

_____

## IN THE INTEREST OF S. A. S., A CHILD

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2017-02192J

## MEMORANDUM OPINION

In this accelerated appeal, *see* TEX. R. APP. P. 28.1, 28.4; TEX. FAM. CODE ANN. § 109.002(a–1), appellant, P.S. ("Father") challenges the trial court's decree terminating his parental rights to his minor child, S.A.S. ("Sally") and appointing the Department of Family and Protective Services as Sally's sole managing conservator. In his first three issues, Father contends that the evidence is legally

and factually insufficient to support the trial court's findings under Section 161.001 of the Family Code. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (b)(2). In his fourth issue, Father contends that the trial court abused its discretion in appointing the Department as Sally's sole managing conservator. We affirm.

## Background

A.P. ("Mother") has three children: I.P. ("Ian"), Sally, and M.S. ("Mitzi"). Ian is not Father's son, but Sally and Mitzi are Father's daughters. Although Sally is the subject of this suit, to provide context, we begin by discussing Ian.

Ian was born in July 2007. Between 2010 and 2015, the Department received at least five referrals concerning Ian. In June 2010, the Department received a referral alleging that two-year-old Ian had been sexually abused by an unknown predator. The Department ruled out the allegation. In February 2013, when Ian was five years old, the Department received another referral alleging sexual abuse by an unknown alleged predator. The Department was unable to determine the allegation. In November 2013, the Department received a referral alleging that Mother had physically abused six-year-old Ian. The Department was unable to determine the allegation. In January 2015, the Department received a referral alleging that Mother had medically neglected Ian. The Department found that there was reason to believe the allegation. And, in November 2015, the

2

Department received a referral alleging that Mother had physically abused Ian.[1] The Department found that there was reason to believe this allegation as well.

The Department further investigated the referrals received in 2015 and eventually filed a petition to terminate Mother's parental rights to Ian. The trial court appointed the Department as Ian's temporary managing conservator, and Ian was placed in foster care. The trial court then signed an order approving and requiring Mother to follow a family service plan prepared for her by the Department. Mother did not comply with the terms of the plan. In the following months, Mother tested positive for methamphetamine and marijuana, and she failed to participate in court-ordered services.

During the pendency of Ian's case, in late November 2016, Mother gave birth to Sally. About six weeks later, in January 2017, the Department received a referral accusing Mother of neglectful supervision. After conducting a preliminary investigation, the Department filed a petition to terminate Mother's and Father's parental rights to Sally and requested that it be appointed Sally's temporary managing conservator. In an affidavit, the Department's investigator stated that a temporary conservatorship was necessary because Mother had endangered her first child, Ian. Mother had an extensive history of drug use, which included the use of

---

[1] Specifically, the referral alleged that Mother had appeared disoriented and under the influence of unknown substances while providing care for Ian and that Ian had been exposed to domestic violence involving weapons.

methamphetamine and marijuana. Mother's hair had tested positive for marijuana a month after Sally's birth, which proved that Mother had used drugs while pregnant with Sally. And, Mother had failed to submit to drug testing or complete other services in her other case involving Ian.

On April 20, 2017, the trial court signed an emergency order, which appointed the Department temporary managing conservator of Sally. At the time, Father was living in Florida. When Father learned what had happened, he returned to Texas and moved in with Mother.

On June 8, 2017, the trial court signed an order that suspended visitation because Mother and Father had tested positive for marijuana. The order also approved and required Mother and Father to follow the family service plans prepared for them by the Department.

Among other things, Father's family service plan required him to undergo a psychological evaluation and follow all recommendations; undergo a substance abuse assessment and follow all recommendations; maintain contact with the caseworker; participate in parenting classes; and submit to random drug tests, with the understanding that failure to do so would be treated as an automatic positive result.

The plan included the statutorily-required admonishment that failure to comply could result in the termination of Father's parental rights. *See* TEX. FAM.

4

CODE ANN. § 263.102(b). Father signed the plan, and the trial court found that Father had reviewed it and understood its terms.

On July 27, 2017, the trial court in Ian's case signed a decree that terminated Mother's parental rights. The trial court found that termination was in Ian's best interest and justified on grounds of endangerment, abandonment, and violation of court orders.

In December 2017, when Sally's case was still pending, Mother gave birth to another girl, Mitzi.

In April 2018, Sally's case was tried to the bench.  At the time of trial, Sally was 16 months old and living with foster parents who intended to adopt her. Mitzi was still living with Mother and Father.

The Department presented a number of exhibits, including the results of Mother's and Father's drug tests and Father's psychological evaluation. The Department also presented testimony from a number of witnesses, including the caseworker, a court-appointed investigator, and a child advocates volunteer.

The Department's evidence established that, in the 10 months that followed the trial court's order suspending visitation and approving the family service plans in Sally's case, Mother and Father consistently failed (or failed to appear for) random drug tests, and, as a result, never regained visitation. The evidence further established that Father failed to comply with other provisions of his family service

plan. Specifically, Father failed to take parenting classes, despite being afforded three opportunities to do so. Father did not complete a substance abuse assessment on time, and once he did undergo an assessment, he failed to attended NA meetings as recommended. He failed to maintain contact with his caseworker, who testified that Father often appeared to be deliberately ignoring her. Finally, the Department's evidence established that Sally was thriving in her foster-to-adopt placement.

After the hearing, the trial court terminated Mother's and Father's parental rights to Sally. In its termination decree, the trial court found that termination of Mother's parental rights was in Sally's best interest and justified on grounds of endangerment. The trial court found that termination of Father's parental rights was in Sally's best interest and justified on grounds of endangerment and failure to comply with court orders. The trial court appointed the Department as Sally's sole managing conservator. Father appeals.[2]

## Sufficiency of Evidence

In his first three issues, Father contends that the evidence is legally and factually insufficient to support the trial court's findings that (1) termination was justified on grounds of endangerment, (2) termination was justified on grounds of failure to comply with court orders, and (3) termination was in Sally's best interest.

_____

[2] Mother has not filed an appeal.

## A.    Applicable law and standard of review

Under Section 161.001 of the Family Code, the Department may petition a trial court to terminate a parent-child relationship. The trial court may grant the petition if the Department proves, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

Section 161.001 lists 21 acts and omissions justifying termination of the parent-child relationship. TEX. FAM. CODE ANN. § 161.001(b)(1). "Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (internal quotations omitted) (quoting *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003)).

In determining whether termination is in the child's best interest, courts consider the nine nonexclusive factors listed by the Texas Supreme Court in *Holley v. Adams*: (1) the desires of the child, (2) the emotional and physical needs of the

7

child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the parent's acts or omissions that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the parent's acts or omissions. 544 S.W.2d 367, 372 (Tex. 1976).

Further, "the same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interests of the child." *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

In a legal-sufficiency review in a parental-rights-termination case, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.*

In a factual-sufficiency review in a parental-rights-termination case, we

8

determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). By focusing on whether a reasonable factfinder could form a firm conviction or belief, the appellate court maintains the required deference for the factfinder's role. *Id.* at 26. "An appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *Id.* We should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

## B. Failure to comply with court order

We begin by considering Father's second issue, in which he contends that there is legally and factually insufficient evidence to support the trial court's finding that termination was justified under Section 161.001(b)(1)(O). TEX. FAM. CODE ANN. § 161.001(b)(1)(O). Termination is justified under subsection (O) if the trial court finds that the parent:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of

9

the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

*Id.*

Father's family service plan was "a court order that specifically established the actions necessary for [Father] to obtain [Sally's] return." *See id.* The evidence presented at the termination hearing shows that Father failed to comply with a number of the plan's provisions.

**Parenting classes.** Father failed to complete parenting classes. Father's family service plan required him to complete parenting classes, provide a certificate of completion to his caseworker, and then demonstrate the skills he learned at visitations with Sally. The plan required that Father begin parenting classes by August 1, 2017. The caseworker testified that Father did not complete or even register for parenting classes, even though he was afforded at least three opportunities to do so. The caseworker explained that, during the pendency of the suit, Father received notifications of the dates and times of three different parenting classes, but Father never signed up for any of the classes.

At the termination hearing, Father testified that he never registered for parenting classes because the classes would have caused him to miss too much

10

work and possibly lose his job.[3] However, Father also testified that he only worked part-time. And he failed to present evidence that the schedules for any of the parenting classes conflicted with his schedule for work.

**Psychological evaluation.** Although Father completed a psychological evaluation, he did not "participate fully" in the evaluation, as required by his family service plan. In her report, the psychologist stated that Father "was extremely resistant to the evaluation process." She described him as "combative," "defensive," and "noncompliant." She therefore concluded that her diagnosis might not have been a "true reflection of [Father's] emotional functioning" and explained that her diagnosis might have "changed had [Father] been more forthcoming."

Further, Father failed to follow the psychologist's recommendations. Among other things, the psychologist recommended that Father complete parenting classes, participate in individual therapy to address Father's difficulty with interpersonal relationships, and submit to random drug testing. Father did not follow any of these recommendations.

**Substance abuse assessment.** Father did not complete a substance abuse assessment on time and did not follow all of the provider's recommendations. Father's family service plan required that he attend, participate in, and successfully

---

[3]    In his brief, Father contends that he completed parenting classes. But as evidence, Father cites to a certificate of completion for a substance abuse treatment program, not parenting classes. Thus, Father's contention is unfounded.

11

complete a substance abuse assessment by July 1, 2017. The plan further required that he follow all the provider's recommendations. The plan specifically referred him to Denise Bradley. Father did not complete a substance abuse assessment with Bradley. Bradley scheduled several appointments with Father, but Father never appeared for any of them and never actually met Bradley in person. On August 17, 2017, Bradley terminated services due to Father's lack of attendance.

After Bradley terminated services, the Department referred Father to another provider, the Wellness Center. Father completed a substance abuse assessment with the Wellness Center on November 15, 2017. The assessment diagnosed Father with marijuana use disorder. It recommended that Father complete individual and group outpatient substance abuse therapy. It also recommended that Father attend in NA meetings. Two weeks before the termination hearing, Father completed group outpatient therapy. However, he never began attending NA meetings.

**Random drug testing.** Father failed to submit to random drug testing and to remain drug free. Father's family service plan required that he "maintain a drug-free lifestyle" and that he complete random drug tests within 24 hours of notification.

Throughout the pendency of the suit, Father was notified that he had to complete random testing on 11 separate occasions. Father appeared for testing four times. And each time, he tested positive for marijuana, marijuana metabolites, or

synthetic marijuana. Specifically, on May 1, 2017, Father's hair and urine tested positive for marijuana metabolites; on September 14, 2017, Father's hair tested positive for marijuana and marijuana metabolites, and his urine tested positive for marijuana and synthetic cannabinoids; on December 7, 2017, Father's hair tested positive for marijuana metabolites; and on January 9, 2018, Father's hair tested positive for marijuana and marijuana metabolites. Father did not appear for testing and was thus presumed to have tested positive on April 20, 2017; May 27, 2017; May 31, 2017; June 8, 2017; June 30, 2017; July 28, 2017; and October 26, 2017.

In his brief, Father admits that he "consistently test[ed] positive for marijuana during the case." He further admits that "he no-showed for testing on more than one occasion."

At the termination hearing, Father initially testified that he missed so many drug tests because he was out of town and the caseworker could not reach him. But, he later admitted that the caseworker had his contact information. And, the caseworker, in turn, testified that Father had "a pattern of not responding throughout this case." As an example, the caseworker testified that, in October 2017, she notified Father via text message that he had to submit to random drug testing, and Father responded that he could not make it because he was working in Austin. The caseworker then asked Father where he was specifically so she could find him a nearby Austin provider, but Father stopped responding to her texts.

**Maintain contact.** Father failed to maintain contact with his caseworker. Father's family service plan required Father to maintain biweekly contact with the caseworker by leaving messages on her cell phone or office phone. The caseworker testified that he did not maintain biweekly contact throughout the entire case: "Some months he did, some months he didn't."

Father argues that the evidence is insufficient because he completed some of his family service plan.[4] We disagree. "The Family Code does not provide for substantial compliance with a family services plan." *In re M.C.G.*, 329 S.W.3d 674, 675 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *see In re J.M.T.*, 519 S.W.3d 258, 267 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("[S]ubstantial or partial compliance with a court-ordered family service plan is insufficient to avoid termination."). And even if it did, Father did not substantially complete his family service plan; he failed to comply with significant and material provisions.

We hold that there is legally and factually sufficient evidence to support the trial court's finding that termination was justified under subsection (O). Therefore, we overrule Father's second issue. Father's first issue challenges the sufficiency of the evidence for the alternative predicate findings—that termination was justified on grounds of endangerment under subsections (D) and (E). *See* TEX. FAM. CODE

---

[4] Father does not contend that Section 161.001(d) applies. *See* TEX. FAM. CODE ANN. § 161.001(d).

14

ANN. § 161.001(b)(1)(D), (E). However, because we have found that the evidence is both legally and factually sufficient to support the predicate finding of failure to comply with a court order, we need not address the father's first issue. *See In re A.M.*, 495 S.W.3d at 580.

## C.    Sufficiency of best-interest finding

In his third issue, Father contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in Sally's best interest. We consider the evidence supporting each of the nine non-exhaustive *Holley* factors.

**First factor: Sally's desires.** Sally was 16 months old at the time of trial. Because of her age, she could not testify, and there is no direct evidence of her desires. There is, however, indirect evidence that Sally would have desired to stay with her foster parents. Sally never knew Father, and, by the time of trial, was no longer familiar with Mother. Due to the Parents' positive drug tests, the trial court suspended their visits with Sally toward the beginning of termination suit, on June 8, 2017. The Parents never tested negative and therefore never regained visitation. Thus, the last time Sally saw the Parents was when she was six months old. The child advocate testified that Sally had bonded with her foster parents. She further testified that Sally's foster parents loved Sally and intended to adopt her. Father admits that he "missed the opportunity to bond" with Sally "during the pendency

of the case" and that Sally is "presumed bonded to her foster parents." From this evidence, a reasonable factfinder could conclude that Sally desired to remain with her foster parents.

**Second factor: Sally's present and future emotional and physical needs.** Father recognizes that Sally "is doing well in her foster-to-adopt placement." But, he contends that Sally would do "just as well" with the Parents, as evidenced by the adequate care they were providing their newborn, Mitzi, at the time of trial. In her report, the Department investigator wrote that Sally appeared healthy and clean during her initial visit with Mother (when Father was still in Florida). And, the caseworker testified that she had no concerns about Mitzi and that the Parents appeared to be providing her adequate care.

However, other evidence shows that, while the Parents were capable of satisfying Sally's present and future emotional and physical needs, it was unlikely that they actually would. The Parents continued to use marijuana and synthetic marijuana throughout the pendency of the termination suit, fully aware that doing so would result in the termination of their parental rights to Sally. Throughout the case, Father consistently failed (or failed to appear for) his drug tests, and the caseworker provided testimony suggesting that on at least one occasion Father deliberately ignored her when she notified him that he needed to submit to drug testing. After his substance abuse assessment, Father was diagnosed with

marijuana use disorder. As treatment, the provider recommended that he attend NA meetings, but Father failed to do so, even though it was a requirement of his family service plan. Mother, for her part, had a long history of drug abuse, including the abuse of not only marijuana, but methamphetamine. Like Father, she tested positive for marijuana and related substances throughout the entire case.

At the termination hearing, Father testified that he stopped smoking marijuana shortly after the Department was appointed Sally's conservator, and he denied ever having tried synthetic marijuana. Father's testimony contradicted the results of his drug tests, indicating that Father's testimony was false.

The Parents' failure to remain drug free and complete their family service plans raises concerns about their ability to satisfy Sally's present and future needs, as does Father's avoidance of the caseworker and false testimony. From this evidence, a reasonable factfinder could conclude that the Parents lack the discipline and self-control necessary to provide Sally with adequate care on a sustained basis.

**Third and eighth factors: the present and future emotional and physical danger to Sally and acts or omissions indicating improper parent-child relationship.** As discussed, both Parents tested positive for drugs throughout the entire case. The trial court appointed the Department as Sally's conservator in part because Mother had tested positive for drugs. Then, the trial court suspended

visitation because Mother and Father tested positive for drugs. And, Mother and Father never regained visitation because they continued to test positive for drugs. Father was not honest about his drug use, and he did not attend NA meetings, which was a requirement of his family service plan. From this evidence, a reasonable factfinder could conclude that Mother and Father are either unwilling or unable to stop using drugs, indicating that they would pose a danger to Sally's emotional and physical well-being if Sally were returned to them.

Further, in determining the best interest of a child, a factfinder may consider evidence of a parent's past behavior that endangered the well-being of the child and infer that the conduct may recur in the future if the child is returned to the parent. *See, e.g.*, *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). The evidence shows that Mother has a long history of drug abuse and CPS referrals and that she lost custody of her oldest child, Ian, because she was unable to stop using drugs and failed to complete (or even attempt to complete) her court-ordered services. The evidence further shows that Mother used drugs while pregnant with Sally and Mitzi and that Father lived with Mother during the latter pregnancy. Father emphasizes that he has no criminal record and had not been involved with CPS before the instant suit. Even so, a reasonable factfinder could infer that Sally would be subjected to endangering conduct in the

future if she were returned to Father by virtue of his continuing relationship with Mother.

In contrast, Sally's foster parents, as Father concedes, were providing her with a safe, stable, and nurturing environment. Sally had bonded with them. And, as of the termination hearing, Sally had lived with them longer than she had lived with Mother. From the record, it appears that Sally has only met Father once, during the Parents' first (and only) visitation in this case.

**Fourth factor: the parental abilities of the individuals seeking custody.** Mother and Father appeared to be adequately caring for Mitzi, which is evidence that they could adequately care for Sally as well. However, Father did not complete (or even register for) parenting classes. And, even if he had completed the classes, he would not have been able to demonstrate what he learned, as the trial court suspended and never reinstated visitation due to his continued drug use.

In contrast, it was undisputed that Sally's foster parents provided a loving, stable, and safe environment for her. They successfully completed the training, study, and other requirements necessary to become licensed foster parents. *See, e.g.*, TEX. FAM. CODE ANN. § 101.017 (defining "licensed child placing agency"); TEX. HUM. RES. CODE ANN. §§ 42.001 *et seq.* (licensing scheme for facilities, homes and agencies that provide child-care services). The caseworker testified that the foster parents were meeting Sally's need and that she had no concerns with the

placement. The court-appointed investigator testified that Sally's foster parents were loving, nurturing, and engaging. The child advocate recommended that Sally remain with her foster parents.

**Fifth factor: the programs available to assist these individuals to promote the best interest of the child.** In his brief, Father states: "Presumably, the parents would be given a modified [family service plan] upon restoration of their parental rights." He does not identify the programs that would be offered under such a plan. Nor does he claim that he would actually participate in such programs. From Father's past behavior, a reasonable factfinder could infer that Father would not avail himself of the programs made available to him.

In contrast, Sally's foster parents were licensed, which meant they had completed various training and study requirements. If adopted, Sally will likely enjoy additional benefits provided by the State for the assistance of adopted children. *See, e.g.*, TEX. FAM. CODE ANN. §§ 162.304 (adoption financial assistance program), .306 (permitting post-adoption services to adoptees and adoptive families), .603 (requiring child-placing agency to provide adoptive parents information about community resources and services).

**Sixth and seventh factors: the plans for the child by these individuals or by the agency seeking custody and the stability of the home or proposed placement.** The evidence shows that the Parents were raising Mitzi in a one-

bedroom apartment. Father testified that if Sally were returned to him, he would be able to buy or lease a larger residence. Father testified that he wanted his children to go to college and "have everything."

The evidence shows that Sally's foster parents were providing her excellent care and planned to adopt her. The caseworker, court-appointed investigator, and child advocate testified that the foster parents provided a safe, stable, and nurturing environment. In his brief, Father recognizes that Sally's "foster-to-adopt placement reportedly is safe, stable, protective and meeting all of [Sally]'s needs." With her foster parents, Sally was "happy and healthy." Sally had visibly bonded with her foster parents; she became excited whenever she saw them. The foster parents sent Sally to a special daycare where she was learning English, Spanish, and sign language.[5]

From this evidence, a reasonable factfinder could conclude that, while Sally would receive love in either home, she would have more permanence and stability with her foster parents.

Considering the *Holley* factors and reviewing all of the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of Father's parental rights was in the best interest of Sally. Moreover, none of the disputed

---

[5]     The record does not indicate whether Sally is hearing impaired.

evidence was so significant that the factfinder could not have formed such a firm belief or conviction. We therefore conclude that the evidence was both legally and factually sufficient to support termination of Father's parental rights to Sally. We overruled Father's third issue.

## Sole Managing Conservatorship

In his fourth issue, Father contends that the trial court abused its discretion in appointing the Department sole managing conservator of Sally.

A managing conservator is authorized to determine the child's primary residence. *See Phillips v. Beaber*, 995 S.W.2d 655, 660 (Tex. 1999); *In re C.A.M.M.*, 243 S.W.3d 211, 215 n.7 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also* TEX. FAM. CODE ANN. § 153.132 (listing "rights and duties" of parent appointed sole managing conservator), § 153.371 (listing "rights and duties" of non-parent appointed as sole managing conservator). The managing conservator has nearly sole authority to make decisions for the child. *See* TEX. FAM. CODE ANN. §§ 153.132, 153.371; *see also In re R.L.*, No. 01-16-00851-CV, 2017 WL 1496955, at *13 (Tex. App.—Houston [1st Dist.] Apr. 21, 2017, no pet.) (mem. op.); *In re N.L.D.*, 412 S.W.3d 810, 816 (Tex. App.—Texarkana 2013, no pet.) ("Conservatorship of a child includes the day-to-day management of the child.").

The termination of parental rights and the appointment of a non-parent as sole managing conservator are two distinct issues, requiring different elements,

different standards of proof, and different standards of review. *Compare* TEX. FAM. CODE ANN. § 161.001 *with id.* § 153.131(a); *see In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007); *Earvin v. Dep't of Family & Protective Servs.*, 229 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2007, no pet.). The primary consideration in conservatorship determinations should always be the child's "best interest." TEX. FAM. CODE ANN. § 153.002; *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Under Section 153.131, a trial court may appoint a non-parent, such as the Department, as sole managing conservator if it "finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development." TEX. FAM. CODE ANN. § 153.131(a). In determining the child's best interest for the appointment of a managing conservator, the court must consider both the Section 263.307 factors and the *Holley* factors described above. *In re A.C.*, 394 S.W.3d at 644; *see* TEX. FAM. CODE ANN. § 263.307(b) (listing 13 factors).

We have already held that legally and factually sufficient evidence supports the trial court's findings that termination was in Sally's best interest. It follows that the trial court's finding that appointment of Mother and Father as conservator would not be in Sally's best interest is also supported by legally and factually sufficient evidence. We hold that the trial court did not abuse its discretion in

appointing the Department sole managing conservator of Sally. Therefore, we overrule Father's fourth issue.

## Conclusion

We affirm the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Brown and Caughey.